
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL DOCKET NO.: 5:07CV89-V

Larry McCloud, Administrator of the )
Estate of Garry Wayne McCloud )
             Plaintiff, )
              )
        v. )       **Memorandum and Opinion**
              )
Melissa Hildebrand and )
The City of Hickory, North Carolina, )
             Defendants. )
_____ )

     **THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment

pursuant to FED. R. CIV. P. 56(c), and all materials submitted in support of or in opposition

thereto. (Documents ##16,17, 32, 35) Melissa Hildebrand ("Hildebrand") and The City of

Hickory, North Carolina, ("City of Hickory), seek summary judgment on all of the claims

brought by Plaintiff Larry McCloud, Administrator of the Estate of Garry Wayne McCloud

("McCloud"). This matter is ripe for disposition by the Court.

## I.    FACTUAL BACKGROUND

     On September 21, 2006, Hildebrand was on duty with the Hickory Police Department,

wearing her full police uniform and operating a marked Hickory Police Department patrol car.

(Hildebrand Aff. ¶ 5.)[1]

     Around 5:44 p.m., the Hickory Communications Center ("Communications") sent out a

domestic violence call to respond to Ridgecrest Apartments and Hildebrand told

---

[1] Portions of the recitation of facts come from the Affidavit of Melissa Hildebrand. (Document #21).
Plaintiff's Complaint did not include a statement of facts of the events prior to McCloud's arrival in the
parking lot.

Communications that she would respond. (Id. at ¶ 7.) The caller reported that her boyfriend was causing problems, damaging property, and had "hit the caller and a child" at the apartment complex. (Id.) Communications also dispatched another officer to the scene. (Id.)

Communications informed Hildebrand while she was en route to the scene that the "boyfriend had left the scene and was traveling in a blue Chevrolet." (Id. at ¶ 8.) Hildebrand arrived at the apartment complex nine minutes after receiving the initial call at approximately 5:54 p.m. (Id.)

Upon arriving, Hildebrand observed that a white female, Ms. Linda Andrews, ("Andrews") was "bleeding from her head or face and had blood on her hands." (Id. at ¶ 9.) After speaking with Andrews and another woman, Hildebrand learned that Andrews was the victim of the domestic violence call and that McCloud was the suspect. (Id.) Through an open window of Andrews' apartment, Hildebrand observed "the window air conditioner lying on the kitchen floor, a broken table, chairs strewn about, and broken dishes." (Id.) Andrews also told her that a baby had been hit with a chair. (Id.) After confirming that McCloud had already fled the scene, Hildebrand diverted the second officer en route to the scene to police headquarters to retrieve a domestic violence camera. (Id.)

Hildebrand then proceeded to the parking lot to obtain her notebook and report back to her supervisor. (Id. at ¶ 10.) Hildebrand was taking notes when someone said "There he is." (Id.) Then, a blue truck sped into the parking lot and ran directly into Andrews' car. (Id.) The force of the collision reportedly turned the car sideways. (Id. at ¶ 13.) Hildebrand, Andrews, and another bystander had been standing only a few feet away and jumped out of the way to avoid being hit by the car. (Id.) Hildebrand called for assistance and advised that the suspect had

returned to the scene.  Records indicate that Hildebrand made the call asking for backup at 6:03 p.m.  (Id.)

McCloud exited the vehicle and started walking towards Hildebrand and Andrews. (Id. at ¶ 14.) According to Hildebrand, McCloud was "irate and enraged." (Id.) Hildebrand drew her weapon and ordered McCloud to get on the ground.  (Pl.'s Repl. To Def.'s Mot. For Summ. J., Doc. # 32, 2.) McCloud complied briefly but shortly thereafter got back off the ground and walked towards Hildebrand. (Id.) Hildebrand ordered McCloud to get back on the ground several times but he did not comply. (Hildebrand Aff., Doc # 21 at ¶ 16.) As McCloud moved towards Hildebrand, he challenged her to shoot him.[2]  McCloud was not armed nor did he have anything in his hands. (Doc. # 32, 2.)  The parties dispute whether McCloud "struck" Hildebrand's firearm or "tried to get her gun" (Doc. #21 at ¶ 18; Doc. # 32, 4.)

Hildebrand continued to back away from McCloud as he approached her. (Doc. #21, ¶ 19.) Eventually, Hildebrand fired her weapon at McCloud. (Id. at ¶ 19.) Hildebrand stated that after the first shot McCloud kept coming towards her and she fired again. (Id.)

Hildebrand fired her weapon a total of four times and struck McCloud twice in the abdomen and once in the back. (Doc. #32, 2.)  The parties disagree about whether  Hildebrand fired the third shot into McCloud's back before he fell to the ground or after he was lying face down on the ground. (See Compl. ¶ 7; See Doc. #17, 7.)

---

[2] McCloud reportedly commented to Hildebrand:

> "What are you going to do, shoot me? Go ahead, you'd be doing me a favor."
> "Just shoot me, you bitch, if you're going to shoot me,"
> "You're just going to have to shoot me,"
> (Id. at ¶ 17.)

After she had shot McCloud, Hildebrand radioed for an ambulance and emergency services. (Doc. #21 at ¶ 20.) She kept her weapon pointed towards McCloud until backup arrived. (Id.) The agency's call log reveals that Hildebrand's call came in at 6:04 p.m. – a mere 1 minute after McCloud returned to the scene.

Officer Aaron Miller ("Miller") arrived approximately two minutes after Hildebrand shot McCloud and took charge of the scene. (Id. at ¶ 22.) After other officers began to arrive, Hildebrand was taken to Police Headquarters. (Id. at ¶ 23.)

McCloud was immediately taken to the Catawba Valley Medical Center where he died of multiple gunshot wounds. (Doc. # 32, 4.) His body was then transferred to Wake Forest Baptist Medical Center where Dr. Patrick Lantz ("Lantz") performed an autopsy. (D. Patrick Lantz Dep., Doc. # 25, 17-16.) Lantz testified that based solely upon his examination, he had no way of ascertaining the order in which the three (3) bullets fired entered the Decedent's body.[3] (Lantz Dep. 16-17) For purposes of recording and describing his autopsy findings, Lantz assigned each wound a number and identified them as follows: Wound #1 – entered through the left abdomen; Wound #2 – entered near the center of the chest; and Wound #3 – entered through the back. (Lantz Dep. 12-13) Lantz testified that all three of McCloud's wounds were potentially fatal and that the shots fired into the abdomen and the back would certainly have been fatal. (Id. at 13-14, 38.)

On behalf of the Estate of Gary Wayne McCloud, Plaintiff Larry McCloud commenced suit in Catawba County Superior Court, State of North Carolina. Defendants removed the action to this federal court on August 10, 2007. Plaintiff's Complaint alleges the following: 1) Use of

---

[3] Lantz recognized, however, that with a thorough investigation of the scene and reliable eyewitness testimony regarding where McCloud was, what he was doing, what position he was in, it might be possible to narrow down the particular order of the shots. (Lantz Dep. 17)

Excessive Force under 42 U.S.C §1983, 2) Violations of the 4th, 5th, 8th, and 14th Amendments, 3) Intentional Infliction of Emotional Distress, 4) Wrongful Death, 5) Intentional Homicide, 6) Intentional Murder, [4] and 7) Negligence by the City of Hickory in Failing to Adequately Train, Supervise, and Provide Sufficient Response.

## II.  DISCUSSION

### A. Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is in dispute when its existence or non-existence could lead a jury to different outcomes.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Id.

When considering motions for summary judgment, courts must view the facts and inferences in the light most favorable to the non-moving party.  Id., at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990). The moving party bears the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, (1986).  The burden then shifts to the opposing party to produce "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

[4] Plaintiff alleges homicide and murder in addition to the excessive force and wrongful death claims. However, neither Defendant nor Plaintiff discuss these issues in their respective briefs. Since these arguments essentially merge with the excessive force claim, the Court need not analyze those claims separately.

The party opposing summary judgment may not rely upon mere allegations or denials, to defeat a motion for summary judgment and a "mere scintilla of evidence" is insufficient to overcome summary judgment. Anderson, 477 U.S. at 249-50. Summary judgment is only appropriate where "the facts and the law will reasonably support only one conclusion." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (quotation omitted). When resolution of issues of fact depends upon a determination of credibility of the evidence, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

**B.  Use of Excessive Force Pursuant to 42 U.S.C. §1983 / Qualified Immunity**

Qualified immunity protects public officials from individual liability unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). Qualified immunity is an affirmative defense that the defendant has the burden of pleading. Gomez v. Toledo, 446 U.S. 635, 640 (1980). Generally, government officials performing discretionary functions are granted qualified immunity and are thus "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982). Whether or not a police officer is entitled to qualified immunity is a question of law for the court, and when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. Willingham v. Crooke, 412 F.3d 553 (4th Cir. 2005).

A defense of qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law'," and it "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines'." Waterman v. Batton,

7

393 F.3d 471, 476 (4th Cir. 2005) (citations omitted). If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. Saucier, 544 U.S. at 201.

A court required to rule upon qualified immunity must consider two issues. As an initial matter, the court must decide "whether a constitutional right would have been violated on the facts alleged". Saucier, 533 U.S. at 201. Next, assuming that the violation of the right is established, the court must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct was violating that right.' Id. [5] Only when both of these questions are answered in the affirmative is the defense of qualified immunity unavailable.

A right is "clearly established" when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 615 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Determining what is "clearly established" "depends largely upon the level of generality at which the relevant legal rule is to be established." Id. at 614 (internal quotations omitted). "[T]he proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Gould v. Davis, 165 F.3d 265, 269 (4th Cir. 1998) (citation omitted); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (noting that "general statements of the law are not inherently incapable of giving fair and clear warning" of which rights are clearly established).

---

[5] Although this sequential, two-step procedure is no longer mandatory in light of the recent Supreme Court decision in Pearson v. Callahan, 129 S. Ct. 808 (2009), it may still be followed where appropriate, as in the present case.

## 1. Violation of Section 1983

The Court will first consider whether, taking the facts in the light most favorable to the Plaintiff, there was a constitutional violation arising from the use of excessive force. The standard for evaluating claims against government officials for excessive use of force is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Conner, 490 U.S. 386, 397 (1989). The "reasonableness" of a particular use of force must be judged from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham. 490 U.S. at 397, (citing Terry v. Ohio, 392 U.S. 1, 20-22 (1968)); see also Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996) ("the suggestion that [other] officers might have responded differently is exactly the type of second look that case law prohibits); see also Anderson v. Russell, 247 F.3d 125, 132 (4th Cir. 1996) (the focus is "on the circumstances as they existed at the moment force was used."). Additionally, the Supreme Court has guided district courts to keep in mind that "police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. Graham, 490 U.S. at 367.

Graham provides three factors for the Court to consider when inquiring into the objective reasonableness: (1) "the severity of the crime"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. The extent of the plaintiff's injury is also a relevant consideration. See Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994); See Pressly v. Gregory, 831 F.2d 514, 517 (4th Cir.1987).

9

"A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (citing Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)). "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Tennessee, 471 U.S. at 11-12. Furthermore, the Fourth Circuit has held that "the Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists," and that "[o]fficers need not be absolutely sure...of the nature of the threat or the suspect's intent to cause them harm." Elliott, 99 F.3d at 643.

Likewise, with regard to an escalating physical confrontation between an officer and a resisting suspect, the use of force can be evaluated "at every stage ... of the incident." Bates ex rel. Johns v. Chesterfield County, 216 F.3d 367, 371-72 (4th Cir. 2000); Greenridge v. Ruffin, 927 F.2d 789, 791-792 (4th Cir. 1991); see also Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999) (explaining that "[a] passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect"); Dickerson v. McClellan, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996) (analyzing separate segments of single encounter may be appropriate if "the officers' initial decision to shoot was reasonable under the circumstances but there was no need to continue shooting"); Hopkins v. Andaya, 958 F.2d 881, 886-88 (9th Cir. 1992) (per curiam) (dividing a several-minute encounter into two segments and holding that even if the first application of force was constitutional, the second may not have been). In Waterman v. Batton, the Fourth Circuit

spoke to the rationale for conducting a step-by-step, sequential reasonableness analysis. The Waterman court explained:

> It is established in this circuit that the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed. To simply view all of the force employed in light of only the information possessed by the officer when he *began* to employ force would limit, for no good reason, the relevant circumstances to be considered in judging the constitutionality of the officer's actions. We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.

Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) (*internal quotations omitted and emphasis in original*)).[6]

Given this precedent, and the evidence tending to show that the third shot (Wound #3) was fired into McCloud's back, it is appropriate to analyze the third shot independently.

### i. The First Two Shots / Wounds #1 and #2

Taking the facts in the light most favorable to the Plaintiff, and applying the "objective reasonableness" factors articulated in Graham, the Court finds that the first two shots fired by Officer Hildebrand did not constitute an unreasonable seizure and, therefore, were consistent with the Fourth Amendment.

---

[6] The Waterman panel addressed earlier circuit opinions in which the analysis was undertaken or premised upon the notion that the use of force was a single event to be analyzed after looking to the entirety of the circumstances. 393 F.3d at 480-483; *See* Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994) (rejecting "artificial divisions in the sequence of events" under which force was used) and Pittman v. Nelms, 87 F.3d 116 (4th Cir. 1996) (granting immunity to shots fired at a car that had passed the officers because the events were dangerous and unfolded only within a few seconds)). In an attempt to reconcile its more recent ruling in Waterman with its statement in Rowland about the defendant "missing the forest for the trees," the Circuit Court clarified that it did not mean to reject "the notion that the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Waterman, 393 F.3d at 481. Rather, the Rowland court rejected "the idea that any of the events should be reviewed outside the context of the conduct that precipitated the seizure." Id.

The first Graham factor, the "severity of the crime at issue" weighs in favor of the Defendants. Although Hildebrand had not yet had an opportunity to formally charge McCloud with a crime, Hildebrand could have charged McCloud with one or more offenses of assault as a result of the domestic dispute and his driving into Andrews' truck upon his return to the scene. McCloud could also have been charged with property damage based upon the condition of Andrews' apartment and the damage to her car.

Second, Defendants present sufficient evidence that McCloud posed an immediate threat to Hildebrand's safety and the safety of those at the scene. Hildebrand observed Andrews bleeding from her head or face and had blood on her hands, and through an open window of Andrews' apartment, observed "the window air conditioner lying on the kitchen floor, a broken table, chairs strewn about, and broken dishes." (Doc. # 21, ¶ 9.) Hildebrand also heard Andrews' statement that a baby had been hit with a chair. (Id.) Hildebrand next witnessed McCloud's return to the scene, including driving his vehicle at a high rate of speed directly into Andrews' truck. (Id. at ¶ 9.) Further, the fact that McCloud was unarmed is not dispositive as to the nature of the threat he posed. Simply put, the evidence tends to show that Decedent, described as "irate and enraged," was out-of-control.[7]

The third factor also weighs in favor of Defendants. McCloud was "actively resisting arrest" by not obeying Hildebrand's verbal commands to stay on the ground or move away from her. After initially complying with Hildebrand's order to get on the ground, McCloud "lunged"

---

[7] The autopsy revealed that McCloud's blood alcohol level (.07) was just slightly lower than the legal limit per North Carolina's driving while impaired laws. (Lantz Dep. 42) However, McCloud was not screened for any other substance. (Id.) Hildebrand's deposition testimony and affidavit concerning McCloud's apparent agitation and aggressive behavior is corroborated by other witnesses at the scene. (See SBI Statement of Interview with Marecia Covington, Doc. 17-10, 5; SBI Statement of Interview with Ciera McClain, Doc # 17-9 10; SBI Statement of Interview with Demetria Covington, Doc. # 17-9, 7.)

at her and approached her in an "aggressive manner." (Hildebrand Aff. ¶ 16.) According to Hildebrand, McCloud continued to approach and twice managed to strike her firearm. (Id. at ¶17, 18.) While Hildebrand could have taken the chance McCloud would not have inflicted harm upon her or any of the other witnesses at the scene, "[t]he Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." Elliott, 99 F.3d at 641. Additionally, "[T]he Fourth Amendment does not require omniscience.... [o]fficers need not be absolutely sure ... of the nature of the threat or the suspect's intent to cause them harm-the Constitution does not require that certitude precede the act of self protection." Id., at 644; Slattery v. Rizzo, 939 F.2d at 215-16 (deadly force appropriate when suspect failed to comply with officer's order to raise his hands and officer reasonably believed suspect to be coming at him with a weapon, although the "weapon" turned out to be a beer bottle).

Viewing the facts in the light most favorable to the Plaintiff Estate, Plaintiff's showing is insufficient to overcome summary judgment. Anderson, 477 U.S. at 249-50. Hildebrand's split-second decision to use deadly force against McCloud was reasonable in light of Hildebrand's well-founded objective belief that McCloud was threatening to harm her and perhaps others at the scene. Thus, Hildebrand's use of deadly force in firing *the first two shots* (shots to the chest and abdomen) does not constitute a Fourth Amendment violation for unreasonable seizure.[8]

---

[8] In light of the Court's holding that McCloud's constitutional right to be free from an unreasonable seizure was not violated as a result of the first two shots, additional qualified immunity analysis is unnecessary.

13

## 2. The Third Shot / Wound #3

There is a genuine issue of material fact as to whether it was objectively reasonable for Hildebrand to fire *a third shot* (shot in the back) at McCloud. Plaintiff asserts that the third shot was discharged by Hildebrand while McCloud was essentially helpless and defenseless. (Compl., ¶¶X, XXXV, XLIII) ("lying on the ground, unmoving and semi conscious," "as he lay face down on the ground, helpless.") Plaintiff contends that Hildebrand fired the final shot after McCloud had fallen to the ground and that "there can be no legitimate reason for shooting a mortally wounded, unarmed man in the back while he is lying immobile on the asphalt." (Doc. # 32, 7.) In fact, Andrews, the domestic violence victim, stated in her SBI interview that she heard a third shot *after* she saw McCloud on the ground. (SBI Statement of Interview with Andrews, Doc. 17-1, 8). In response, Hildebrand states that she does not specifically recall (but does not deny) firing a third shot. (Doc. # 21 at ¶ 19.) These differing accounts of the incident create a genuine issue of material fact as to whether Hildebrand reasonably perceived McCloud as an imminent threat when she fired the third shot. Stated differently, it is for the jury to determine whether Hildebrand should have recognized the passing of the risk of serious harm before discharging her weapon a third or fourth time.

Moreover, at this stage of the proceedings, qualified immunity does not protect Hildebrand from defending against this aspect of Plaintiff's §1983 action. First, viewing the evidence in the light most favorable to the Plaintiff, a jury could reasonably find that the circumstances did not require Hildebrand to fire a subsequent shot at McCloud based upon McCloud's immobilization as a result of the first two shots. On the other hand, Lantz agreed

with defense counsel that the impact of the second shot could have caused McCloud's body to turn or fall prior to the third or fourth shot entering McCloud's back. (Lantz Dep. 46) In addition, the period of time between McCloud's return to the scene and the sequence of events that led Hildebrand to employ deadly force took only seconds (approximately one minute). For these reasons, with respect to the shot to McCloud's back, the question of §1983 violation cannot be determined as a matter of law.[9]

Secondly, should a jury find a constitutional violation, the specific constitutional right identified by the Plaintiff was clearly established at the time of the incident. In <u>Waterman</u>, the Fourth Circuit expressly held that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *See* <u>Waterman</u>, 393 F.3d at 481 (*citing* <u>Abraham</u>, 183 F.3d at 294.) <u>Waterman</u> involved a ten-plus minute vehicle chase initiated due to speeding and the suspect's refusal to stop upon activation of emergency sirens and lights. It was relayed to officers via emergency communication channels that the suspect (Waterman) had attempted to run another officer off the road minutes earlier.[10] The suspect's projected path was within a few feet of the location of several law enforcement officers. In response, three officers fired upon the vehicle and discharged eight rounds in a period of approximately six seconds. Waterman sustained five gunshot wounds and died. Considering the use of deadly force in that context, the Fourth Circuit determined that separate

---

[9] To the extent Defendants assert that the third shot could not have been a proximate cause of McCloud's death given the medical examiner's opinion that any of the three shots could have been fatal, the Court simply notes that proximate cause is a quintessential jury question. *See generally,* Section 1983 Litigation, Second Ed. Federal Judicial Center §VIII "Causation" (2008) ("Causation in §1983 actions is usually a question of fact for the jury.")

[10] It was also reported via radio communications that Waterman appeared to have reached under the seat of his car (i.e., could have been reaching for a weapon) and, thus, might be armed and dangerous.

analysis was required for the group of shots fired as the car was accelerating towards the officers and the group of shots fired after the car had passed since "the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." Waterman, 393 F.3d at 481 (*internal citations omitted*). The circuit court ultimately held that (i) the initial group of shots did not violate the Fourth Amendment; (ii) the shots fired after the car passed were unconstitutional as an unreasonable seizure because the threat of injury from the car was no longer imminent; (iii) notwithstanding the same, the officers were protected by qualified immunity with respect to all of the conduct (*i.e.*, both groups of shots) because the law on that point, namely, the unconstitutionality of the subsequent shots, was not clearly established in that jurisdiction prior to the Waterman decision. The Fourth Circuit reversed the district court's denial of summary judgment and remanded the case for further proceedings. Hence, applying the rule of law announced in Waterman, *if* a jury were to find that the events unfolded as described by Plaintiff, and McCloud was either on his knees with his back towards Hildebrand or lying face down on the pavement, then it would be clear to an objectively reasonable officer that the third gunshot was unnecessary as the threat posed by McCloud had already passed. *See* Waterman, 393 F.3d at 482 ("[A] necessary premise to our conclusion that the forecasted evidence could demonstrate the unconstitutionality of the subsequent shots is that an imminent threat of serious physical harm to an officer is not sufficient to justify the employment of deadly force seconds after the threat is eliminated if a reasonable officer would have recognized when the force was employed that the threat no longer existed.") Since the Court finds that there are genuine issues of material fact precluding summary judgment on

Plaintiff's excessive force claim regarding the third shot (i.e., wound to the back), this part of Plaintiff's §1983 claim survives summary judgment.

### C. Wrongful Death Claim, N.C. Gen. Stat. §28A-18-2

Under North Carolina law, "[a] wrongful death negligence claim must be based on actionable negligence under the general rules of tort liability." Mabrey v. Smith, 548 S.E.2d 183, 186 (N.C.App. 2001) (citing Mann v. Henderson, 134 S.E.2d 626 (1964)). The elements of negligence are familiar: 1) legal duty; 2) breach of that duty; 3) actual and proximate causation; and 4) injury. Id. (citing Tise v. Yates Constitution Co., Inc., 480 S.E.2d 677 (1997)). The Court's analysis regarding Plaintiff's Section 1983 claim governs analysis of Plaintiff's claims alleging theories of ordinary negligence. See Sigman v. Town of Chapel Hill, 161 F.3d 782, 788-89 (4th Cir.1998); Ingle v. Yelton, 345 F.Supp.2d 578, 584 (W.D.N.C. 2004).

Contributory negligence is the breach of duty of a [party] to exercise due care for his or her own safety, such that the [party's] failure to exercise due care is the proximate cause of his or her injury. Prior v. Pruett, 550 S.E.2d 166, 173 (N.C.App.2001) (citing Champs Convenience Stores v. United Chemical Co., 329 N.C. 446, 455 (1991); London v. Hamilton ,1996 WL 942865 (W.D.N.C. 1996). "[A] plaintiff cannot be guilty of contributory negligence unless he acts or fails to act with knowledge and appreciation, either actual or constructive, of the danger of injury which his conduct involves." Clark v. Roberts, 263 N.C. 336, 343 (1965) (citation omitted).

Ordinary contributory negligence acts as a complete bar to a plaintiff's recovery. Prior, 550 S.E.2d at 173. However, contributory negligence is not a bar to a plaintiff's recovery when the defendant's gross negligence, or willful or wanton conduct, is a proximate cause of the

plaintiff's injuries. <u>Yancey v. Lea</u> 354 N.C. 48, 51(2001) (citing <u>Brewer v. Harris</u>, 279 N.C. 288, 297(1971)).

"Issues of contributory negligence, like those of ordinary negligence, are ordinarily questions for the jury and are rarely appropriate for summary judgment." <u>Id.</u> at 623, (quoting <u>Nicholson v. Am. Safety Utility Corp.</u>, 346 N.C. 767, 774, (1997). "Only where the evidence establishes the plaintiff's own negligence so clearly that no other reasonable conclusion may be reached is summary judgment to be granted." <u>Id.</u>

Defendant contends that even if the Estate's wrongful death claim survived summary judgment, its recovery would be barred by the decedent's own contributory negligence. Under these facts, a determination as a matter of law regarding ordinary or gross contributory negligence is admittedly a close call because McCloud's refusal to obey Hildebrand's commands (and, potentially, his inflammatory words) effectively forced a confrontation with law enforcement. *See* <u>London</u>, 1996 WL 942865 (robbery suspect who was shot by police deemed to be contributorily negligent as a matter of law because a reasonable person would have obeyed the officer's orders and would not have pointed a gun at them). There is also undisputed evidence that McCloud challenged Hildebrand verbally as he approached her, although the Court cannot be sure of his exact words. However, because the undersigned has determined that a genuine issue of material fact exists regarding whether Hildebrand's third shot (the wound to the decedent's back) was objectively reasonable, the Court will similarly deny summary judgment on the wrongful death claim and leave this fact-intensive inquiry for the jury. <u>See</u> <u>Sigman</u>, 161 F.3d at 788-89 (dismissing state law claim for wrongful death where court concluded that the law enforcement officer's actions were, as a matter of law, reasonable for purposes of §1983).

18

**D. Eighth Amendment Claim**

Defendants' Motion for Summary Judgment on Plaintiff's 8th Amendment claim is granted. The Supreme Court has held that, "the Cruel and Unusual Punishments Clause 'was designed to protect those convicted of crimes…and consequently the Clause applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions'." Whitley v. Albers, 475 U.S. 312, 318 (1986) (citing Ingraham v. Wright, 430 U.S. 651, 664, 671 (1977)). Thus, Plaintiff's 8th Amendment claim must be dismissed.

**E. Fifth Amendment Claim**

Defendants' Motion for Summary Judgment with regards to Plaintiff's 5th Amendment claim is granted. In Graham v. O'Conner, the Supreme Court held that a claim for excessive use of force is not cognizable or does not lie as a potential due process claim under the 5th Amendment given the opportunity for redress pursuant to the 4th and 14th Amendments. Graham, 490 U.S. 386. For this reason, Plaintiff's claim under the 5th Amendment must be dismissed.

**F. State Law Claim Alleging Excessive Force**

Plaintiff's state law excessive force claim is analyzed consistent with the federal §1983 claim. See Williams v. City of Jacksonville, 599 S.E.2d 422, 429 (N.C.App. 2004); Todd v. Creech, 209 S.E.2d 293, 295 (N.C.App. 1974); see also N.C. GEN. STAT. 15A-401(d). This cause of action survives summary judgment with respect to the third shot (wound to the decedent's back) only.

**G. Intentional Infliction of Emotional Distress**

Defendant's Motion for Summary Judgment is granted with respect to Plaintiff's intentional infliction of emotional distress ("IIED") claim. To prove a claim for intentional

infliction of emotional distress under North Carolina law, a plaintiff must show (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress. Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981); see also Waddle v. Sparks, 414 S.E.2d 22, 27 (N.C.1992). "Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Johnson v. Colonial Life & Acc. Ins. Co., 618 S.E.2d 867, 872 (N.C.App.2005) (internal citation omitted). There is no evidence of severe emotional distress. McCloud is deceased. Moreover, the record does not support the theory that Officer Hildebrand engaged in extreme and outrageous conduct intended to cause severe emotional distress.

### H. Public Officers' Immunity Doctrine / Claims Against Officer Hildebrand In Her Individual Capacity

It is well established that a public official is immune from personal or individual liability for mere negligence in the performance of his or her duties, but is not shielded from liability if the alleged conduct was corrupt or malicious, or if he or she acted outside and beyond the scope of his or her duties. Prior v. Pruett, 550 S.E.2d at 173-74; Jones v. Kearns, 462 S.E.2d 245 (1995). The public officer's immunity doctrine protects Hildebrand from liability absent a finding by the jury in Plaintiff Estate's favor on any of the narrow issues that are proceeding to trial. In other words, should the jury determine in the course of considering the Plaintiff's §1983 or wrongful death claims that Defendant engaged in conduct that was corrupt or malicious, or that Defendant acted outside and beyond the scope of her duties in any way – neither of which is

supported by the existing record -- Hildebrand would not be protected by the public officers' immunity doctrine.

## I.  Claims Against the City of Hickory

A plaintiff seeking to impose liability on a city for the constitutional torts of its employees under § 1983 must prove that some municipal "policy" or "custom" caused a deprivation of the plaintiff's rights. Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 694 (1978). A single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless the conduct was caused by an existing unconstitutional policy or custom. See Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985); Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir. 1987). "It is only when the execution of the government's policy or function…inflicts the injury that the municipality may be held liable under § 1983. Springfield v. Kibbe, 480 U.S. 257, 267 (1987).

Here, Plaintiff has failed to provide any evidence of a pattern, policy, or custom, or practice condoning or encouraging the violation of McCloud's Constitutional rights.  Likewise, McCloud has not produced any evidence that the City of Hickory has a policy, custom, or practice of providing inadequate training, failing to supervise, or failing to provide sufficient response.  Hildebrand received all the training required by the State of North Carolina, including the initial and annual use of force training. (T. Adkins Aff.).  Even if the Court concludes that Hildebrand acted inappropriately, the City will not be held liable since Plaintiff has only alleged this one instance of misconduct.

Additionally, the City of Hickory did not violate the Department's policy on Response to Domestic Violent Disputes by only providing one officer at the scene because the policy does

not mandate that two officers respond to each call. (Id.) Since there is no evidence showing that the City of Hickory had a policy, custom, or practice condoning or encouraging the violation of McCloud's constitutional rights, this Court grants Defendants' Motion for Summary Judgment on all claims against the City of Hickory.

### J. Punitive Damages

To succeed on a claim for punitive damages under § 1983, a plaintiff must show that the defendant acted with a malicious or evil intent or in the callous disregard of his federally protected rights. Smith v. Wade, 461 U.S. 30 (1983).

To succeed on a claim for punitive damages under North Carolina law, a plaintiff must prove (1) an aggravating factor of fraud, malice or willful or wanton conduct (2) by clear and convincing evidence. N.C. Gen. Stat. § 1D-15 (2003). The clear and convincing evidence standard is a greater burden than preponderance of the evidence, and must fully convince the trier of fact. Schenk v. HNA Holdings, Inc., 613 S.E.2d 503, 508 (N.C. Ct. App. 2005). Willful or wanton conduct is defined as "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen.Stat. § 1D-5(7) (2003). Moreover, the statute describes "willful or wanton conduct as "more egregious than gross negligence." N.C. Gen. Stat. § 1D-5(7).

Notwithstanding the Court's analysis concerning the third gunshot (wound to the decedent's back), the record simply does not support a claim for punitive damages. The encounter between the decedent and Officer Hildebrand lasted approximately one (1) minute. Viewing the evidence in the light most favorable to the Plaintiff, at best, Officer Hildebrand

acted negligently in continuing to discharge her firearm . There is no evidence Officer

Hildebrand acted with an intentional disregard or indifference for the safety of others. Plaintiff's

claim for punitive damages against Officer Hildebrand is dismissed.

Plaintiff's claim for punitive damages against the City of Hickory must fail. In City of

Newport v. Fact Concerts, Inc., the Supreme Court held that punitive damages cannot be

awarded against a municipal entity. 453 U.S. 247, 261 (1981).


### III. CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment is **GRANTED**

**in part** and **DENIED in part**. Defendants' motion is denied as to the Section 1983 claim and

state law excessive force claim relevant to the third gunshot (Wound #3 to McCloud's back).

Defendants' motion is also denied as to Plaintiff's wrongful death claim, N.C. GEN. STAT. §28A-

18-2. Defendants' motion is granted as to all other claims.

Accordingly, the remaining causes of action will proceed to jury trial during the January

2011 Statesville Division Trial Term, with Calendar Call on Monday, January 10, 2011, and Jury

Selection to begin on Tuesday, January 11, 2011.

**THIS** the 16th day of November, 2010.

**RICHARD L. VOORHEES**
**U.S. DISTRICT JUDGE**